Filed 6/23/17 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>OVERSTOCK.COM, INC.,<br><br>      Defendant and Appellant. | A141613<br><br>(Alameda County<br>Super. Ct. No. RG10546833)<br><br>ORDER GRANTING REQUESTS<br>FOR PUBLICATION AND<br>MODIFICATION OF OPINION<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on June 2, 2017, be modified as follows:

1.  On page one, paragraph one, replace portion of the paragraph beginning "In the unpublished portion of this decision, . . ." and concluding with the end of the paragraph with the following:

    Overstock contends the trial court erred in applying the four-year limitations period of section 17208; that there is insufficient evidence to support the trial court's finding that Overstock made false and misleading statements in violation of the laws against unfair business practices and false advertising; and that the trial court imposed excessive penalties and improperly ordered injunctive relief.  We shall affirm the judgment.

2.  On page 27, section II(C), delete the first full paragraph which reads:

    In the unpublished portion of this opinion, we have concluded the evidence is sufficient to support (1) the findings that Overstock made false and misleading statements when it used the term "List Price" and when it based reference prices on similar products, formulas, and the highest price that

1

could be found and (2) the trial court's finding that Overstock knew or should have known these practices were false or misleading in violation of the UCL and FAL.

3. On page 31, the full citation to *Hale v. Morgan* in the fourth sentence in the first full paragraph shall be modified to read:

*Hale v. Morgan*, *supra*, 22 Cal.3d at pp. 401, 404-405

There is no change in the judgment.

As so modified, the opinion is certified for publication in its entirety.

Dated: _____                          _____, P.J.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>OVERSTOCK.COM, INC.,<br><br>      Defendant and Appellant. | A141613<br><br>(Alameda County<br>Super. Ct. No. RG10546833) |

Overstock.Com, Inc. (Overstock) appeals a judgment entered after the trial court found it had engaged in unfair business practices (Bus. & Prof. Code,[1] § 17200 et seq.) and false advertising (§ 17500 et seq.)  The court granted injunctive relief and imposed $6,828,000 in civil penalties.  In the unpublished portion of this decision, we conclude that the trial court properly applied the four-year limitations period of section 17208 and that there is sufficient evidence to support the trial court's finding that Overstock made false and misleading statements in violation of the laws against unfair business practices and false advertising.  In the published portion, we reject Overstock's arguments that the court imposed excessive penalties and improperly ordered injunctive relief.

## I.  BACKGROUND

Overstock is an online retailer with a stated goal of being an "extreme value" retailer selling products for the lowest prices on the Internet.  Overstock was founded in 1999, and originally offered primarily products from businesses that were liquidating

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections II(A) and II(B).

[1] All undesignated statutory references are to the Business and Professions Code.

excess inventory.   Overstock now obtains most of its goods from third party "fulfillment partners."

The product pages on Overstock's website compared the price at which it offered an item to an advertised reference price (ARP or reference price), which it referred to by various terms during the times at issue in this case.  From somewhere before 2003 until September 2007, the product pages showed a "List Price" for the product, with the number stricken through; it then showed the price at which Overstock was offering the product and, below that, was a calculation of the difference, expressed both in dollar amounts and percentages.[2]  In September 2007, Overstock changed the "List Price" label to "Compare at," and in April 2011, it changed the term to "Compare."  A commercial from 2013 claimed:  "We compare prices so you don't have to," and an executive confirmed the commercial was consistent with Overstock's advertising strategy and was intended to instill a sense of confidence that the company offered products at good prices. He also confirmed that advertisement of reference prices gave customers confidence that they were shopping at a site that offered real savings.  Overstock's internal research showed in 2007 that "the best predictor of whether a customer returns to our site is whether they feel they have 'received a good deal,' " and an employee email from 2008 indicated "compare at" pricing "definitely helps entice the customer to purchase." Products that did not have "compare at" prices suffered reduced sales.[3]

---

[2] For example:

| List Price: | $999.00 |
| Today's Price: | $449.99 |
| You Save: | $549.01 |
| | (55%) |

[3] Between 70% and 90% of Overstock's products carried a list price that came from standard industry data.  These items were primarily books, movies, music, and games.  They are not at issue in this case, which concerns the products with comparison prices that were not set by the standard industry data.

Before the Fall of 2008, Overstock had no process in place to ensure that all comparison prices were verified. The term "List Price" in Overstock parlance meant "a high street price, a full retail price," and Overstock's policies allowed the list price to be set by finding the highest price for which an item was sold in the marketplace. Overstock did not determine whether other Internet retailers had made any substantial sales at the comparison price. In an internal email from 2007 entitled "List Price," an Overstock manager told employees that they "probably do not want to use Amazon [to set list price] "as they will be similar to our price. I need you to find the HIGHEST selling price. We found out it can include freight, which will make it even higher." Another internal email chain, from 2006, discussed the pricing for an electronic item and said, "Oh, I think it's been established that the "List Price" is egregiously overstated. This place has got some balls." An employee in the same email chain noted that the "List Price" for a certain type of rug used to be $500, but had been increased to $800. In other emails, an Overstock employee asked a supplier to raise the price for which it offered its goods on its own web site so that, in comparison, Overstock's prices would be the lowest available on-line, and another employee asked a supplier to "bump up" the manufacturer's suggested retail price (MSRP).

The "List Price" was sometimes derived from that of similar products. This might happen, for instance, if a product was made exclusively for Overstock. Before 2007, Overstock employees were not given any specific guidelines for determining whether an item was similar enough to be considered comparable to the product offered by Overstock. And customers were never informed when a similar, rather than identical, product was used for a comparison price.

Overstock also sometimes used "formulas" to derive list prices; these could be based on a number of methods, such as doubling or tripling the cost to Overstock or the usual wholesale cost. A February 2008 email from an employee suggested that list prices could be derived by multiplying the Overstock price by 1.2, to show a discount of 20

3

percent off list price.  An Overstock manager acknowledged that this method would result in an arbitrary number and stated that she would not have allowed the list price to be derived in that manner because there was no documentation to show that anyone else was selling it at that price.  Before September 2007, Overstock's employees did not receive any instruction or training on when to use a formula to set a comparison price for a product.

In July 2007, a Shasta County resident, Marc Ecenbarger, bought two identical patio sets that showed a list price of $999 and an Overstock price of $449.  Ecenbarger believed the patio sets retailed at the higher price and that, because of that price, they would be of good quality.  When the patio sets arrived, however, he found they were poorly made and unstable.  One of the tables had a sticker showing it was sold by Wal-Mart for $247.  Ecenbarger checked several other Internet sites and found two or three of them selling identical patio sets for $247.  He complained to Overstock and received a full refund.  Even after his complaint, the patio set remained on Overstock's web site, with the same purported list price, for "quite a while," and Overstock sold the sets at the price paid by Ecenbarger through August 2007.  Overstock had received a similar complaint about the patio set four months previously but had not changed the pricing.  Ecenbarger reported the matter to the district attorney.

Ralph Mondeaux, Overstock's Vice President of Marketing, sent a letter to Overstock's fulfillment partners in September 2007 "as a reminder that when you provide a 'List Price' associated with a product you sell on our website, it must be in compliance with Overstock.com's policy regarding 'List Price.' "  The letter set forth the acceptable ways to set list price, in order of preference:  (1)  Use the MSRP if there is confirmation of an instance in which the product has been offered for sale at that price.  (2)  Use the price for the same item offered on-line or, if the item is not available on-line, from a storefront retailer.  (3)  Use the price for a nearly identical item offered on-line or from a storefront retailer, taking into account "such facts [as] brand name, etc. and not merely

4

the functionality of the product." (4) "[U]se an estimated price derived from standard wholesale and retail markups for [the] type of product." The letter asked the fulfillment partners to prepare documentation of their list prices. Correspondence with Overstock's vendors indicated this request was made in response to the district attorney's investigation.

Overstock changed the term it used for the comparison price from "List Price" to "Compare At" in September 2007. For the first year the "Compare at" term was used instead of "List Price," there was no change in Overstock's policy on how comparison prices were set. Overstock did not have a process in place to verify that a product had been sold at the comparison price. There were instances in which Overstock employees discussed with suppliers the possibility of raising their MSRP so that Overstock could show a higher discount. Overstock continued to use comparison prices that were the highest price at which an item was offered for sale, even if the "street price," or price at which the item could be bought in other stores, was lower.

In July 2008, Overstock conducted a study to determine whether its MSRP prices were inflated in comparison to the market. Among a random selection of ten of the top 100 selling products from each department, "compare at" prices were on average 15.30 percent higher than the highest actual selling price on line. Among a random selection of 10 products from the top 100 items with the greatest "you save" percentage, the "compare at" prices were 32.81 percent higher than the highest on line selling price. And among a random selection of ten additional products from each department, the "compare at" prices were on average 12.96 percent higher than the highest actual on line selling price.

In October 2008, Overstock removed the "compare at" pricing from most of its products and allowed them to be re-posted only if the fulfillment partner provided a verified reference price. The result was a drop of six percent or more—in some cases up to 20 percent—in sales of products that did not show a "compare at" price. Overstock

saw an increase in "conversion"—or the percentage of site visitors who bought products—of 8.9 percent when "compare at" prices were added.

Overstock also formed a "pricing validation team" to verify that the items it sold were actually sold elsewhere at "compare at" prices submitted by buyers or fulfillment partners, and to re-verify those prices every 90 days. Fulfillment partners were asked to fill out spreadsheets listing, among other things, the high street price and low street price of each item. Internal communications showed that the team sought to verify the highest street price for the product, which showed the greatest percentage of savings. Jonathan Johnson, an executive who had been with Overstock since 2002, testified that it would not surprise him to learn that members of Overstock's "validation team" had a practice of using the highest price in the marketplace as a comparison.

Under Overstock's new policy, the pricing validation team was not allowed to validate prices based on the sales prices offered by the fulfillment partners themselves. However, there were still instances in which Overstock employees and fulfillment partners discussed the possibility of the partners raising the prices for their products on their own websites or on Amazon in order to create a higher comparison price.

The validation team did not use formulas to set reference prices. It sometimes verified a high street price for an item that was similar, rather than identical, to that sold on Overstock. Overstock received numerous complaints from customers that the "compare at" prices were inflated.

In April 2011, Overstock began using the term "Compare" rather than "Compare at" for its comparison prices. Overstock's guidelines provided that the "Compare" price "*must be a bona fide price* at which the product is being offered for sale or sold." Overstock also began using the term "MSRP" on its website as the ARP for some items. The guidelines for "Compare" and MSRP pricing stated that "Compare" prices must be revalidated every three months and MSRP prices generally must be revalidated every six

6

months.  Overstock continued using comparison prices based on products that were similar but not identical.[4]

After the People began investigating potential claims against Overstock, the parties entered into an agreement tolling the statute of limitations as of March 24, 2010. The People, through a number of district attorneys,[5] filed this action on November 17, 2010, alleging causes of action for unfair business practices (§ 17200) and for false advertising (§ 17500), i.e., making untrue and misleading statements concerning pricing, price reductions, source of products, and shipping charges (§§ 17500).  After extensive discovery, a court trial began in September 2013.

At trial, the People adduced the facts already described.  In addition, each party presented expert testimony.  Dr. Larry Compeau, the People's expert in the field of advertised reference prices, their effects on consumers, and their capacity to deceive consumers, testified that as ARP's increase, "internal reference prices," or the price that a consumer senses something costs, also increase.  Likewise, consumers' perception of product quality and the "perceived value" of the product, or "the overall value that the consumer attaches to the product," increase as ARP's increase.  As the product's

---

[4] At the time the guidelines were issued, Overstock had a policy of charging $2.95 for non-expedited shipping to most domestic destinations.  Overstock's buyers were told they could add the difference between Overstock's shipping charge and the seller's shipping charges to the "Compare" price.

[5] The district attorneys named in the operative complaint were Nancy E. O'Malley, District Attorney of Alameda County, Matthew L. Beltramo, Deputy District Attorney; Edward S. Berberian, District Attorney of Marin County, Andres H. Perez, Deputy District Attorney; Dean D. Flippo, District Attorney of Monterey County, James R. Burlison, Deputy District Attorney; Gary Lieberstein, District Attorney of Napa County, Catherine C. Borsetto, Deputy District Attorney; Jeffrey F. Rosen, District Attorney of Santa Clara County, Tina Nunes Ober, Deputy District Attorney; Bob Lee, District Attorney of Santa Cruz County, Kelly J. Walker, Assistant District Attorney; Stephen S. Carlton, District Attorney of Shasta County, Anand "Lucky" Jesrani, Deputy District Attorney; and Jill R. Ravitch, District Attorney of Sonoma County, Matthew T. Cheever, Deputy District Attorney.

7

perceived value increases, consumers are less likely to continue comparison shopping and are more likely to decide to purchase the product.[6] These effects are not limited to unsophisticated or gullible consumers; rather, the vast majority of consumers are subject to them. Dr. Compeau did not believe all ARP's were misleading or confusing, and opined that as long as the ARP was "bona fide," it was not deceptive. He described "bona fide" in this context as meaning that the price has "some veracity in the marketplace." This could be done by monitoring the market to compare prices to those of other sellers to determine an average or prevailing market price. An advertiser should be reasonably certain that the higher ARP does not significantly exceed the price at which substantial sales of the article are being made in the area.

Dr. Joel Steckel testified for Overstock as an expert in statistics, marketing, and consumer behavior. He opined that four conditions would have to be met in order for Overstock's consumers to be misled by the ARP's: the consumer must be aware of the reference price; the consumer must form an expectation of what the reference price means; the consumer must believe that Overstock's use of the reference price conforms to that expectation; and Overstock's use of the reference price must differ from that belief. He concluded that a majority of Overstock's customers did not notice reference prices, did not have well-formed expectations of what the reference prices mean, and thought the ARP reflected a high or non-discounted price. However, on cross-examination, he acknowledged that ARP's can help increase a customer's sense that he or she derived some value from the sale and increase customer loyalty. He also acknowledged that between 70 percent and 75 percent of participants in a survey he

---

[6] Although consumers often discount reference price claims, the ARP's still affected their perceptions. In one study, more than two-thirds of participants did not think ARP's were inflated.

8

conducted believed such terms as "MSRP," "compare," and "compare at" reflected "regular average" prices.

Issuing an exceptionally detailed, 93-page statement of decision, the trial court found Overstock had made untrue and misleading statements regarding pricing in violation of the unfair competition law (§ 17200 et seq.) (UCL) and the False Advertising Law (§ 17500 et seq.) (FAL.)[7] The court imposed civil penalties of $6,828,000 pursuant to sections 17206 and 17536. It also ordered injunctive relief, prohibiting Overstock for five years from advertising an ARP based on a formula, multiplier, or other method that would set it on any basis other than the actual price offered in the marketplace; advertising an ARP based on a similar but non-identical product without disclosure; advertising an ARP based on the highest price found anywhere without regard to whether the ARP reflected a substantial volume of recent sales, without disclosure; using an unmodified term such as "compare" as the ARP nomenclature unless the ARP reflected a good faith effort to determine the prevailing market price of the identical product; using the term MSRP or a similar term unless a clear and conspicuous hyperlink defines that term and states that it may not be the prevailing market price or regular retail price; advertising an ARP that was set by adding the cost of shipping, without disclosure; advertising an ARP for longer than 90 days without reverification; advertising an ARP without disclosure of the date of verification; and advertising an ARP without documentation such as a screenshot. The court denied the People's request that customers receive restitution.

---

[7] The UCL claims were based on Overstock's false advertising, that is, its violation of the FAL. (See *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950-951 [violation of FAL necessarily violates UCL].)

9

## II. DISCUSSION

### A. Statute of Limitations

Overstock first contends the trial court used the wrong statute of limitations for the penalties under the UCL. The trial court concluded the proper statute of limitations for the penalties for the UCL claims was four years. (§ 17208.) Therefore, because the parties agreed to toll the statute of limitations on March 24, 2010, the court calculated penalties beginning four years before that date, March 24, 2006. Overstock argues the correct statute of limitations for government penalty claims under the UCL is one year.[8] (Code Civ. Proc., § 340, subd. (b).) This is a purely legal issue, which we review de novo. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)

The UCL authorizes the Attorney General or a district attorney to bring an action to recover civil penalties in the name of the people of the State of California. (§ 17206, subd. (a).) It also provides: "Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued. . . ." (§ 17208.) Our high court has emphasized that this language "admits of no exceptions. *Any* action on *any* UCL cause of action is subject to the four-year period of limitations created by that section." (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179 (*Cortez*).)

Overstock asks us to ignore this clear statutory language and apply instead the one-year limitation of Code of Civil Procedure section 340, subdivision (b) (340(b)), which applies to "[a]n action upon a statute for a forfeiture or penalty to the people of this state." Overstock argues that the UCL's statute of limitations is general in nature and does not specifically address government penalties, and that Code of Civil Procedure

---

[8] Even if we agreed that the proper statute of limitations as to government penalties under the UCL is one year, Overstock acknowledges that the applicable statute of limitations for the FAL claims, which are based on the same conduct, is three years. (§ 17536, Code Civ. Proc., § 338, subd. (h).)

section 340(b) is a more specific limitations statute and should govern the penalties sought by the People.

Overstock's argument is based on the difference between two subdivisions of Code of Civil Procedure section 340. Subdivision (a) of that statute establishes a one-year limitations period for "[a]n action upon a statute for a penalty or forfeiture, if the action is given to an individual, or to an individual and the state, *except if the statute imposing it prescribes a different limitation*." (Italics added.) Subdivision (b), which applies to actions for penalties "to the people of this state," does not contain the final clause excepting circumstances in which the statute imposing the penalty prescribes a different limitation. And, Overstock points out, in an action under the UCL, a public prosecutor may collect civil penalties, but a private plaintiff is limited to injunctive relief and restitution. (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 (*Kasky*).) Because the cause of action for UCL penalties is given only to the public prosecutor in the name of the People, and not to an individual, Overstock argues that it is governed by Code of Civil Procedure section 340(b), and is not subject to an exception if the statute providing the remedy "prescribes a different limitation." (Code Civ. Proc., § 340, subd. (a); see also *Klein v. United States of America* (2010) 50 Cal.4th 68, 80 [courts strive to avoid statutory constructions that render words, phrases, or clauses superfluous].) We disagree.

Code of Civil Procedure section 340 is part of title 2 of the Code of Civil Procedure, and must be read in conjunction with Code of Civil Procedure section 312. That section provides, "Civil actions, without exception, can only be commenced within the periods prescribed in this title, . . . unless where, in special cases, a different limitation is prescribed by statute." As we have explained, a different limitation for UCL actions is prescribed by section 17208.

In any case, even assuming there is a conflict between section 17208 and Code of Civil Procedure section 340(b), we are guided by the well-established rule that, "[w]here more than one statute might apply to a particular claim, 'a specific limitations provision

11

prevails over a more general provision.' [Citation.]" (*E-Fab, Inc. v. Accountants, Inc. Services* (2007) 153 Cal.App.4th 1308, 1316-1317; see also *Sterling Park, L.P. v. City of Palo Alto* (2013) 57 Cal.4th 1193, 1199-1200.)  We are unpersuaded by Overstock's argument that because Code of Civil Procedure section 340(b) refers to actions for *penalties*, it is more specific than section 17208, which applies to any action under the UCL.

An argument similar to one made by *Overstock* was rejected in *People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332, 1341-1342 (*Wilmshurst*).  The Attorney General brought an action to recover civil penalties for violations of division 26 of the Health and Safety Code.  (*Id*. at p. 1339.)  Code of Civil Procedure section 338, subdivision (k) provided a three-year limitations period for "[a]n action commenced under Division 26 . . . of the Health and Safety Code."  Like Overstock, the defendants there argued that Code of Civil Procedure section 340(b) was more specific and should be applied.  The appellate court dismissed this argument, concluding, "It is the one-year limitations statute which *generally* applies to all actions by the state for penalties or forfeitures, while it is the three-year statute which *specifically* applies to division 26 actions for penalties or fines.  Therefore, even if the two statutes could possibly be considered in conflict, we would give effect to the three-year statute. [Citation.]" (*Wilmshurst*, 68 Cal.App.4th at p. 1342.)  We reach the same conclusion here with respect to section 17208 and Code of Civil Procedure section 340(b).

In considering this issue, moreover, we are mindful that "[t]o determine the statute of limitations which applies to a cause of action it is necessary to identify the nature of the cause of action, i.e., the 'gravamen' of the cause of action.  [Citations.]  '[T]he nature of the right sued upon and *not the form of action nor the relief demanded* determines the applicability of the statute of limitations under our code.'  [Citation.]" (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22-23, italics added.)  The gravamen of the People's UCL claim is that Overstock violated the UCL by making false or misleading statements.  The

12

clear language of section 17208, which "admits of no exceptions," provides that *any* action upon *any* UCL claim is subject to a four-year statute of limitations. (*Cortez*, *supra*, 23 Cal.4th at p. 179.) To the extent there is a conflict between section 17208 and Code of Civil Procedure section 340(b), we conclude the four-year limitations period provided by section 17208, rather than the one-year period provided by Code of Civil Procedure section 340(b) for governmental penalty actions in general, is controlling here.[9]

We are not persuaded otherwise by Overstock's reliance on *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 265-270 and *Chatsky & Associates v. Superior Court* (2004) 117 Cal.App.4th 873, 878-879. In those cases, the plaintiff brought the action under the California Uniform Commercial Code based on payment of a check bearing a forged indorsement. (*Hughes Electronics*, 120 Cal.App.4th at pp. 255-256; *Chatsky*, 117 Cal.App.4th at pp. 875-876.) Each appellate court concluded the one-year statute of limitations of Code of Civil Procedure section 340, subdivision (c), rather than the three-year statute of limitations of the Uniform Commercial Code (U. Com. Code § 4111) applied to the action.[10] (*Hughes Electronics*, 120 Cal.App.4th at pp. 265-271; *Chatsky*, *supra*, 117 Cal.App.4th at pp. 878-879.) As

---

[9] Citing *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313-314, Overstock suggests we should construe the UCL's penalty provision as narrowly as possible. Our high court there noted that in an earlier case, *Hale v. Morgan* (1978) 22 Cal.3d 388, 405, it had "construed a portion of [a civil statute] that was concerned solely with the manner of calculating the amount of penalty" narrowly in order to "safeguard[] against the excessive penalization of those found liable under [the] statute." (*Ibid*.) Neither *People ex rel. Lungren* nor *Hale v. Morgan* affects the rules that a more specific limitation statute prevails over a more general one, or that we look to the gravamen of a cause of action to determine the governing statute of limitations.

[10] Section 4111 of the California Uniform Commercial Code provides: "An action to enforce an obligation, duty, or right arising under this division shall be commenced within three years after the cause of action accrues."

13

pertinent, Code of Civil Procedure section 340, subdivision (c) provides for a one-year limitations period for "[a]n action . . . by a depositor against a bank for the payment of a forged or raised check, or a check that bears a forged or unauthorized endorsement.") As noted in *Hughes Electronics*, "It would be difficult to find a statute more precisely tailored to the specific circumstances at issue than section 340(c)." (*Hughes*, 120 Cal.App.4th at p. 270; accord *Chatsky*, 117 Cal.App.4th at p. 878.) The same cannot be said of Code of Civil Procedure section 340(b), which is a broad and general statute of limitations for governmental penalties.

We are similarly unpersuaded by Overstock's reliance on *Foxen v. Carpenter* (2016) 6 Cal.App.5th 284. The plaintiff there sued her former attorneys, alleging a variety of causes of action, including one for unfair and deceptive business practices, based on alleged misconduct during their representation of her in a personal injury action. (*Id*. at pp. 287-290.) In a brief discussion, the appellate court concluded that the UCL cause of action was barred by the one-year statute of limitations in Code of Civil Procedure section 340.6, subdivision (a) for " '[a]n action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services' " because it was more specific than that set forth in section 17208. (*Foxen*, at p. 296.) As the court explained, "[w]ith section 340.6(a), 'the Legislature intended to establish a limitations period that would apply *broadly to any claim concerning an attorney's violation of his or her professional obligations in the course of providing professional services regardless of how those claims were styled in the plaintiff's complaint.*' [Citation.] Section 340.6(a) was enacted 'to eliminate the former limitations scheme's dependence on the way a plaintiff styled his or her complaint.' [Citation.]." (*Id*.at pp. 290-291.) Here, in contrast, the core allegations all relate to false advertising, which is an unfair business practice. Accordingly, the limitations period of section 17208 is both more specific than that of Code of Civil Procedure section 340(b),

14

and more closely aligned with the gravamen of the cause of action. The trial court properly applied section 17208's four-year limitations period.

**B. Substantial Evidence of False or Misleading Statements**

The FAL makes it "unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state . . . in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . ." (§ 17500.)

Our high court has explained, " '[a]ny violation of the false advertising law . . . necessarily violates' the UCL. [Citations.] We have also recognized that these laws prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.' [Citation.] Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' [Citations.]" (*Kasky*, *supra*, 27 Cal.4th at pp. 950-951.) "Actual deception or confusion caused by misleading statements is not required." (*Day v. AT&T Corp.* (1998) 63 Cal.App.4th 325, 332.) "Intent of the disseminator and knowledge of the customer are both irrelevant. Referring to both section 17500 and Civil Code section 3369, it has been said: 'The statute affords protection against the probability or likelihood as well as the actuality of deception or confusion. [Citation omitted.]' [Citations.]" (*Chern v. Bank of America* (1976) 15 Cal.3d 866, 876.) Thus, under the FAL, " '[a] perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose

15

other relevant information, is actionable.' [Citation.]" (*Consumer Advocates v. Echostar Satellite Corp.* (2003) 113 Cal.App.4th 1351, 1362; accord *Day v. AT&T*, 63 Cal.App.4th at pp. 332-333.)

Overstock contends the evidence does not support the trial court's factual findings that it violated the FAL and the UCL. In considering this claim, " '[w]e are bound by the rule that when "a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." [Citations.]' [Citation.] [A defendant] raising a claim of insufficiency of the evidence assumes a 'daunting burden.' [Citation.]" (*Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 678.) The test "is simply whether there is substantial evidence in favor of the respondent. If this 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing. [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

### 1. *List Prices*

The trial court first found that the use of the term "List Price" was a factual representation, and its use for an ARP based on non-identical items or based on formulas was "a false representation because it is not the actual list price for the product being sold" The court concluded that every time Overstock displayed a list price based on a formula or a similar product rather than the actual list price of the identical product, it made an untrue statement. Such a statement, the court concluded, "was 'untrue' because there was *no* list price." Overstock briefly argues that its list prices were "fair estimate[s]" insofar as they were based on markups that are generally used to set retail prices over wholesale, and the trial court failed to offer any "logic, reason, or evidence"

16

to support its finding that "the term 'List Price' implies an actual price rather than an estimate." However, " 'the primary evidence in a false advertising case is the advertising itself.' " (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 100.) The court's conclusion that the term "List Price," without elaboration, *means* "list price"—which is defined as "the basic price of an item as published in a catalog, price list, or advertisement. . . ." (Webster's 9th New Collegiate Dict. (1984) p. 697.)—requires no other logical or evidentiary support.

### 2. *Similar Products and Formulas*

The trial court next ruled that Overstock knowingly misled consumers when it used prices from similar products and formulas to set some reference prices during the time that it used the terms "Compare at" and "Compare." The trial court found the practice was misleading or had the capacity to mislead consumers for several reasons: "First, the advertisements themselves suggest a comparison to real prices for the identical product when unaccompanied by qualifiers that would signal the use of a formula (e.g., 'compare estimated value') or a similar product (e.g., 'compare similar'). Second, . . . experiment and survey results [from defense expert Dr. Joel Steckel] suggest that, while consumers have varying views of different ARP nomenclatures, with respect to any particular nomenclature, a significant portion of consumers view the given label as reflecting a 'regular/average price.' [Citation.] Implicit in that assumption for an appreciable number of consumers is that one is looking at the same product rather than an estimated price or a price for a 'similar' product. Third, to allow the use of formulas or similar products without any disclosure invites abuse, and examples of such abuse are found in this record. [Citation.] Fourth, as already noted, there are qualifiers that can easily be inserted into the nomenclature to signal the nature of comparison—e.g., 'compare similar'—and given the 'informational function' of advertising that supports its First Amendment protection, it is hard to see why it is unreasonable for the State to apply

17

its statutory ban on misleading advertising so as to require more accurate reference terms."

Overstock argues the People did not present substantial evidence that it actually misled customers by using prices from similar products to set reference prices during the periods it used "Compare at" and "Compare." They argue that none of the consumer witnesses the People presented at trial testified that they were misled by Overstock's practices. But whether a consumer was *actually* misled is not the standard. Rather, as we have explained, advertising statements are actionable if consumers are *likely* to be deceived. (*Kasky*, *supra*, 27 Cal.4th at pp. 950-951.) And there is ample evidence from which the trial court could reasonably conclude Overstock's use of reference prices from non-identical products was likely to mislead consumers. "In determining whether a statement is misleading under the [FAL], ' "the primary evidence in a false advertising case is the advertising itself." ' [Citation.] The 'misleading character' of a given representation 'appears on applying its words to the facts.' [Citation.]" (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 679 (*Colgan*).)

On their face, the words "compare" or "compare at," without further qualification, communicate to the reader that the price being compared is for the same, not a different item, and the trial court could properly conclude that using those terms to refer to the price of a *similar* item was likely to mislead a consumer. Specifically, the use of strikethrough font ("Compare at ~~$190.00~~") followed by "today's price" and then a precise calculation of the purported savings, clearly suggests the actual item's price has been reduced. Indeed, one customer testified that she did not understand why Overstock would use a similar item to set the comparison price "instead of using what they are saying they are using."

In addition, as the trial court noted, the evidence showed that the practice of using similar rather than identical items also led to other abuses. One such deception was to use items that were not truly similar. For example, in correspondence with a supplier, an

18

Overstock employee noted that while the supplier might know the difference between two sources of diamonds, "most people don't. In turn, these are seen as similar items and can be compared as such." Another Overstock email stated: "Comparing this dress to a DVF dress is like comparing a Lexus to a Geo Metro." Comparisons to similar products was also used as a device to manipulate the "compare" prices. For example, an Overstock employee advised a fulfillment partner, "[y]ou can also use 'similar' [products]. And it can be as high [a] mark up as you would like, the more the better." Another e-mail said: "Just make sure similar size and materials. The higher [the price] the better."

The trial court's finding that the use of similar products without disclosure is misleading is also supported by the Federal Trade Commission's Guides Against Deceptive Pricing (16 C.F.R. § 233.2(c) (2016), which explains that a "form of bargain advertising is to offer a reduction from the prices being charged either by the advertiser or by others in the advertiser's trade area for other merchandise of like grade and quality—in other words, comparable or competing merchandise—to that being advertised. Such advertising can serve a useful and legitimate purpose *when it is made clear to the consumer that a comparison is being made with other merchandise and the other merchandise is, in fact, of essentially similar quality* and obtainable in the area." (Italics added.) Here, Overstock neither informed the consumer that the prices were for similar, not identical items, nor insured that the compared item was "in fact" of essentially similar quality.

Overstock argues that this evidence is undermined by an admission made by the People's expert, Dr. Compeau. On cross-examination, Dr. Compeau acknowledged that a 2004 article he co-wrote with three other people, "Consumers' Interpretation of the Semantic Phrases Found in Reference Price Advertisements," included the sentence, "In the present study, 'Compare-At' appears to have the fairly consensual meaning of the price one would pay for a comparable product at another store, or for an alternative brand

19

at the same store when not on sale." This statement was made during the article's discussion of interviews with consumers about their understanding of the meaning of terms such as "Manufacturer's Suggested List Price" (MSLP) and "Compare At"; the article concluded the terms were subject to multiple interpretations and might be deceptive. Aside from the quoted statement, the article does not discuss whether consumers would understand these terms to refer to comparable, rather than identical, products, and it does not establish that the use of such terms to refer to similar products is not deceptive. In any case, the question before us is whether there is substantial evidence to support the conclusion the trial court *did* reach, not whether there is evidence that would have supported another conclusion. (*Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 631.)

We also reject Overstock's challenge to the sufficiency of the evidence that its use of formulas was misleading or had the capacity to mislead. As the trial court noted, the advertisements speak for themselves; they "suggest a comparison to real prices for the identical product when unaccompanied by qualifiers that would signal the use of a formula . . . ." This interpretation is corroborated by an Overstock manager who stated that the use of formulas produces an "arbitrary number." The evidence also showed that markups were manipulated to achieve a specific amount of "savings" for the consumer. Two Overstock employee e-mails provide examples: "If the item is a true close out and can't be found anywhere online I will make sure the MSRP listed provides a 40 to 60 percent discount." "Overstock price to customer is generally 20% to 50% less than MSRP. To calculate MSRP take Overstock price [x] 1.2. This gives [the fulfillment partner's] pricing 20% discount off MSRP or list price." In short, the trial court's finding was unquestionably sound. Advertisements showing a "compare at" price followed by a calculation of savings down to the penny, without informing consumers they are looking at an estimated (and possibly manipulated) price, manifestly had the capacity to mislead.

20

### 3. *Highest Price as Basis for ARP*

The trial court also found that it was misleading for Overstock to set ARP's "based on the highest price that can be found without regard to the prevailing market price *and* without any disclosure of the practice." Overstock challenges the sufficiency of the evidence to support this finding.

There is evidence that Overstock used the highest possible selling price to set its ARP's. Overstock's chairman and chief executive officer testified that members of the pricing validation team were specifically allowed to seek the highest price in the marketplace to use as the basis for setting ARP's, and this practice was confirmed by other Overstock employees. In a 2007 email, an Overstock manager stated, "You probably do not want to use Amazon as they will be similar to our price. I need you to find the HIGHEST selling price."

There is also evidence to support a conclusion that this practice had the capacity to mislead customers. Internal correspondence from 2006 provides an example of an employee being instructed to "put the list price [for an iPod] $30 to $40 more than what everybody in the goddam world knows what they go for. I brought it up and left comments in the box below the copy but everybody just sighed in agreement and continued moving along." A customer testified that her decision whether or not to buy a product would be influenced if she knew the highest price in the marketplace had been used to set an ARP. Another customer testified that she was "outraged" to learn that Overstock used the highest available price, and that she considered the practice to be "lying."

Moreover, the Federal Trade Commission's pricing guidelines direct that retail price comparisons "be based upon fact, and not be fictitious or misleading. Whenever an advertiser represents that he is selling below the prices being charged in his area for a particular article, he should be reasonably certain that the higher price he advertises does not appreciably exceed the price at which substantial sales of the article are being made

21

in the area—that is, a sufficient number of sales so that a consumer would consider a reduction from the price to represent a genuine bargain or saving." (16 C.F.R. § 233.2(a) (2016).)

There is other support for the trial court's conclusion. Dr. Compeau testified about a study that showed 72 percent of participants thought such terms as "regular price," "compare at" or "manufacturer's suggested list price" represented either the price an item usually sold at or its price at most other stores, rather than a fictitious, inflated price.[11] Overstock carried out a survey through a third party, which showed that more than half of respondents wanted price comparisons to reflect the "Average retail price." And Overstock's own expert, Dr. Steckel, testified that between 70 percent and 75 percent of participants in a study believed the terms "MSRP," "compare," and "compare at" represented "regular average" prices rather than a price higher than the regular average price.

This evidence is more than sufficient to support a finding that using the highest available price to set the ARP, without regard to the prevailing market price and without disclosure of the practice, had the capacity to mislead. We are not persuaded otherwise by Overstock's reliance on the testimony of customers who stated they understood the ARP's to refer to the price set by the manufacturer or the retail store price. This testimony does not establish that the use of the highest price at which an item was sold was not misleading; indeed, one of these witnesses testified that she thought the "compare-at price" was "*what the average sale—if I went anywhere else on the Internet; department store; right to Samsung*, if it perhaps was Samsung manufacturing, that that would be the suggested retail price." (Italics added.) Additionally, many customers

---

[11] The participants were asked to define "Regular Price," "MSLP," and "Compare At," and given the choices of "The price at which the item usually or normally sells—an everyday price," "The price I would have to pay for the [item] at most other stores," and "A fictitious price that has been inflated to show you that they are giving you a discount."

22

complained to Overstock that the "Compare at" prices were inflated and therefore misrepresented the amount of "savings."

Overstock argues, however, that even if the evidence as a whole—including the evidence provided by its own expert, Dr. Steckel—supports the trial court's finding, the court erred in denying its motion for judgment, which was made after the People had finished their case on the ground, inter alia, of insufficient evidence. (Code Civ. Proc., § 631.8.) The court reserved ruling on Overstock's motion, and denied it after the trial ended, stating that its ruling was based on the evidence the People presented in their case-in-chief.[12]

Overstock contends that in the absence of Dr. Steckel's testimony, there was insufficient evidence that the use of the highest possible price was misleading. The first problem with this contention is that the motion was directed to each *cause of action*. The first cause of action, for untrue and misleading statements concerning pricing, was not directed solely at the use of the highest possible price to set ARP's, but also, inter alia, at the use of non-identical products, the failure to verify reference prices, and the use of formula pricing. Even if Dr. Steckel's testimony was necessary to prove that the use of the highest available price was misleading, Overstock has not shown that defense evidence was needed to support any of the other misleading practices alleged in the first cause of action. In any case, even without the testimony presented during Overstock's

_____

[12] Code of Civil Procedure section 631.8, subdivision (a) provides: "After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision as provided by Sections 632 and 634, or may decline to render any judgment until the close of all the evidence." " ' "The purpose of Code of Civil Procedure section 631.8 is to enable a trial court which, after weighing the evidence at the close of the plaintiff's case, is persuaded that the plaintiff has failed to sustain his burden of proof, to dispense with the need for the defendant to produce evidence. [Citations.]" [Citation.]' " (*Roth v. Parker* (1997) 57 Cal.App.4th 542, 549.)

23

defense, we would conclude the other evidence we have discussed is sufficient to support a finding that the undisclosed use of the highest price on the market had the potential to mislead consumers.

*4.      Overstock's Knowledge That Its Practices Were Misleading*

Overstock argues, however, that there is no evidence that it knew the use of the challenged practices to set ARP's was false or misleading. The FAL applies to an untrue or misleading statement "which is known, or which *by the exercise of reasonable care should be known*, to be untrue or misleading." (§ 17500, italics added.) "Under this section, a statement is false or misleading if members of the public are likely to be deceived. Intent of the disseminator and knowledge of the customer are both irrelevant." (*Chern v. Bank of America*, *supra*, 15 Cal.3d at p. 876, italics added.)

The trial court found that when formulas or "similar" products were used during the "List Price Era," Overstock knew the term "List Price" was false, i.e., it was not an actual list price for that product. Overstock does not dispute these findings. Rather, it argues there was no evidence Overstock knew or should have known its practice of covertly utilizing formulas and similar products to set "compare" prices would mislead consumers. This contention ignores the law and the record. As we have explained, the advertisements themselves are the primary evidence of their misleading nature. (*Colgan*, *supra*, 135 Cal.App.4th at p. 679.) We have already affirmed the trial court's finding that the advertisements had the capacity to mislead consumers where formulas or similar products were used to set ARP's, without disclosure. The same evidence strongly supports an inference that the *designer* of the advertisements knew or should have known of this potential impact. For example, the Federal Trade Commission cautioned against the use of similar products without disclosure (16 C.F.R. § 233.2(c) (2016)), and one of Overstock's managers understood that formulas produced arbitrary numbers.

The trial court also did not err in finding that Overstock knew, or in the exercise of reasonable care should have known, that the use of the highest market price to set the

24

ARP had the capacity to mislead consumers.  (§ 17500.)  We have already noted that customers testified they did not expect the reference prices to be based on the highest price on the market.  The survey commissioned by Overstock produced similar results—consumers want comparison prices to reflect the average retail price.  In addition, the Federal Trade Commission Guidelines directed that an advertiser "be reasonably certain that the higher price he advertises does not appreciably exceed the price at which substantial sales of the article are being made in the area—that is, a sufficient number of sales so that a consumer would consider a reduction from the price to represent a genuine bargain or saving."  (16 C.F.R. § 233.2(a) (2016).)

Overstock argues the People did not prove it had knowledge of the misleading nature of these ARPs because (1) there was no evidence it was aware of the experts' studies and experiments showing consumers' expectations, and (2) hyperlinks on Overstock's product pages demonstrated Overstock itself did not believe its "compare" prices were "prevailing" or "regular/average" prices.[13]  But Overstock's own definition of "compare" prices proves nothing about what the advertisements would reasonably be expected to convey to the consumer.  Nor is it necessary to show that Overstock was aware of the experts' opinions and studies in order to prove Overstock knew, or reasonably should have known its "highest price" practice for setting ARP's would be misleading.

---

[13] The product pages contained hyperlinks to definitions of the reference prices. The definition of "List Price" set forth five possible methods by which Overstock might determine a product's list price and contained the language, "List price is not necessarily the lowest price at which the product is commonly sold, and often will be higher than the actual price at which the product is sold."  The lengthy definition of "Compare at" stated that, in many cases, the price "reflects a price suggested by the manufacturer or supplier of these goods" and that it "may or may not reflect the average or prevailing market price in any area on any particular day."  Overstock acknowledges that these descriptions "may not have been prominent enough to act as a disclaimer and thus did not affect consumer understanding."

Proof of knowledge, like any other fact, can be circumstantial. (*Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1475 [evidence of other injuries from use of defendant's product relevant to show defendant knew of a potential defect]; *Dowden v. Industrial Acci. Com.* (1963) 223 Cal.App.2d 124, 132, fn. 3 [knowledge may be proven circumstantially].) Here, the record as a whole paints a clear picture of Overstock's motivation for the particular design of its ads. Overstock positioned itself as an "extreme value" retailer. As such, its fundamental sales pitch was to show it offered good prices and real savings. The savings were shown by reference to the ARP's. As the trial court explained, "the increase in the conversion rate was considered very important by Overstock and [was] the raison d'être for using ARPs." Thus, the evidence showed that the purpose of the ARP's was to convince consumers to buy from Overstock because they would receive not just the lowest price but also an "extreme value," i.e., the most savings. Given this purpose, the "you save" calculation in the advertisement is a useful sales tool only if consumers perceive the ARP is a "real" price—one they would otherwise normally pay. That this *was* consumers' perception—and that Overstock knew this—is demonstrated by the irate communications to Overstock when customers discovered the ARP's were not real, but inflated prices.[14]

In sum, the record more than adequately supports the court's finding that Overstock knew or should have known the use of formulas, prices for similar products, or

_____

[14] To quote just a few examples: "[T]his is not the truth since there is NO place that this camera truly sells for $250.77. . . . You are advertising lies. This is NOT an incredible savings. The market price of this camera is $99.99, NOT $250.77." "[T]he MSRP listed is over $200 LESS than on Overstock. Sounds like you are playing pricing games with your customers." "Your compare at price of $299.00 is way off from the [brand] product I received whose MSRP is $63.60. My [']You save: $239.01['] is so far off the ACTUAL saving of a mere $3.61 that I feel cheated. . . ." "Your compare is a false argument. . . . Nowhere in the USA does anyone sell [this product] at $517. . . . I am not not not saving 81%." [Capital letters removed]

26

the highest market prices as ARP's—all without disclosure—had the capacity to mislead customers.

## C. Penalties

In the unpublished portion of this opinion, we have concluded the evidence is sufficient to support (1) the findings that Overstock made false and misleading statements when it used the term "List Price" and when it based reference prices on similar products, formulas, and the highest price that could be found and (2) the trial court's finding that Overstock knew or should have known these practices were false or misleading in violation of the UCL and FAL.

Both the UCL and the FAL authorize civil penalties of up to $2,500 for each violation.[15] Each statutory scheme contains an identical directive: "The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (§§ 17206, subd. (b), 17536, subd. (b).)

---

[15] Section 17206, subdivision (a) provides: "Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, [or] by any district attorney . . ." Section 17536, subdivision (a) provides: "Any person who violates any provision of this chapter shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General or by any district attorney, county counsel, or city attorney in any court of competent jurisdiction." The penalties of the UCL and the FAL are cumulative of each other. (§§ 17205, 17534.5; *People v. JTH Tax, Inc*. (2013) 212 Cal.App.4th 1219, 1250.)

The trial court considered three possible ways to set the number of violations: by the number of Californians who saw the offending advertisements, by the number of sales made through the offending pages, and by the number of days Overstock violated the statutes. The court rejected the first two, in part because they would result in excessive penalties of at least hundreds of millions of dollars. The court instead chose the third approach. For the period between March 24, 2006 and October 1, 2008, the court imposed a daily penalty of $3,500, calculated as $1,000 for each of the three types of violations (basing ARP's on formulas, nonidentical products, and the highest possible price), with an additional $500 for "the lack of controls that led to various abuses." From October 1, 2008 (when the validation team process was implemented and Overstock no longer used formulas) through the first date of trial, the court imposed a daily penalty of $2,000. In total, the trial court levied $6,828,000 in civil penalties.

The court laid out the factors upon which it relied. It found the " 'seriousness of the misconduct' " was moderate in that the misconduct was less egregious than that in other reported cases, Overstock's prices were at or below those of its competitors, and the misconduct affected only some of Overstock's product lines. This factor weighed in Overstock's favor. On the other hand, the offending practices were numerous and persistent in that they occurred daily, on thousands of product pages. The court found Overstock's conduct was willful, in that it was inconsistent with the guidelines of the FTC or the Better Business Bureau, and was based on Overstock's objective to brand itself as an extreme value retailer and exaggerate the savings available on its site. Moreover, the resulting penalty was well within Overstock's ability to pay without damaging its competiveness and was necessary for deterrence purposes. Finally, the court noted that it had declined to order restitution to customers because of the difficulty of identifying an appropriate award or appropriate recipients, and that the lack of restitution was a factor in setting the appropriate penalty. The court found the amount it

28

awarded was "the minimum necessary to vindicate the purposes of the statutes and far below what may be within the bounds of its discretion."

Overstock contends this award was an abuse of the trial court's discretion. It argues that the court found its conduct to be of only moderate seriousness; that it did not sell defective products, charge more than advertised, or charge higher prices than its competitors; that the offending practices affected only a portion of its goods; that reference prices provided valuable information to consumers; and that there is no evidence its practices caused concrete injury to consumers.

We review these penalties for abuse of discretion. "Under this standard, '[w]e do not reweigh the evidence or substitute our notions of fairness for the trial court's. [Citations.] "To merit reversal, both an abuse of discretion by the trial court must be 'clear' and the demonstration of it on appeal 'strong.' " ' [Citation.]" (*People v. JTH Tax, Inc.*, *supra*, 212 Cal.App.4th at p. 1250.) "[T]he trial court's discretion in setting civil penalties generally will be upheld." (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 131.)

Overstock has not shown an abuse of discretion here. The trial court explained its reasoning clearly. Although one factor—the finding that the seriousness of the conduct was moderate—weighed in Overstock's favor, the other statutory factors all weighed against Overstock. Those included "the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, [and] the willfulness of the defendant's misconduct." (§§ 17206, subd. (b), 17536, subd. (b).) The offending conduct took place persistently over a period of years and continued not only after Overstock received customer complaints, but after it became aware its conduct was being investigated and prosecuted. Overstock does not dispute that the penalty falls within its ability to pay.

We also reject Overstock's claim there was no "concrete injury" to consumers. The trial court expressly found that Overstock's deceptive pricing practices not only had

the capacity to cause harm but "in fact did so." The fact that Overstock in fact (according to its undisputed evidence) offered the lowest prices in the market does not mean no injury occurred. As the trial court explained, "the most powerful evidence was not that the advertisements led consumers to pay more than they otherwise would have but that there was a reduction in search intentions, an increase in a perception of transaction value and a greater likelihood that the consumers would return to the Overstock webpage." The court declined to order restitution not because there was no harm, but because there was no practical way to determine what might be an appropriate award of restitution or how to identify those who should receive it, short of offering restitution to all customers over the eight-year period—which the court said could be "ruinous."

Overstock's argument that the penalties imposed here are larger than those upheld in any published case also does not persuade us that the penalties here were excessive. In *People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 512-513, 529-531, the court upheld a judgment ordering an insurance company that had sold improper annuity policies to pay $2.5 million in civil penalties *and* to offer restitution to all (nearly 5,000) purchasers. Similarly, in *People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1543 (*Sarpas*), the court affirmed a judgment ordering the defendants (two individuals and their jointly owned company) to pay penalties of $2,407,581 in *addition* to up to $2,047,041 in restitution to the victims of a scheme by which the defendants falsely promised customers they would obtain loan modifications and prevent foreclosure of their homes.[16] And in *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 884-885, 903-904, 923-924, the appellate court upheld a $1,000,000 penalty and the defendants were ordered to pay restitution—which could amount to more than $6,000,000—to the victims of a fraudulent marketing scheme. Here, in contrast to these cases, the trial court did not order restitution and took that into account when

---

[16] The court in *Sarpas* struck the penalties as to another defendant and directed the trial court to recalculate them. (*Sarpas*, *supra*, 225 Cal.App.4th at p. 1567.)

imposing penalties. In any case, none of the cited authorities suggest that the amounts awarded were somehow in the outer limit of penalties that may properly be imposed. Bearing in mind the factors the trial court considered—including the persistence of Overstock's conduct, the number of violations, and the number of years over which the violations took place—we conclude the trial court did not abuse its discretion in calculating the civil penalties.

Overstock also argues the penalties were excessive because governmental inaction had allowed them to accumulate over many years. That is, the People did not bring this action until more than three years after the Shasta County District Attorney began investigating it, and it took an additional three years for the matter to proceed to trial. This delay impermissibly led, Overstock argues, to " 'ever-mounting penalties.' " For this contention, Overstock cites *Hale v. Morgan* (1978) 22 Cal.3d 388, 401, 404-405, which, on its facts, found an award of mandatory, potentially limitless penalties to a tenant constitutionally excessive. (See also *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 713, 731 (*R.J. Reynolds*) [triable issue of fact as to whether Attorney General delayed filing lawsuit to let statutory penalties for distributing cigarettes at multiple events accumulate]; and *Walsh v. Kirby* (1974) 13 Cal.3d 95, 98, 104 [state agency accumulated evidence of recurring illegal alcohol sales, without prior notice, before filing accusation].) But Overstock never raised this issue in the trial court, and so it is waived. (*People v. JTH Tax, Inc.*, *supra*, 212 Cal.App.4th at p. 1232.) Contrary to Overstock's contention, this is not a "purely legal" issue that can be raised for the first time on appeal, but depends on a factual determination, for example, that Overstock had no notice of the People's investigation of the alleged violations or that the People intentionally postponed filing their action in order to accumulate penalties. The argument is, in any case, feckless. Overstock does not contend that the People either delayed or hid their actions for the purpose of accumulating penalties. Overstock has been aware of the investigation since 2007 and negotiated a tolling agreement to delay

31

the commencement of litigation. In the meantime, it chose to continue the offending practices.

We also reject Overstock's argument that the penalty is so grossly disproportionate to the gravity of its offense that it violates the prohibitions against excessive fines found in the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. In reviewing this issue, we accept the trial court's factual findings unless clearly erroneous and determine de novo whether the fine is excessive. (*United States v. Bajakajian* (1998) 524 U.S. 321, 336, fn. 10; see also *R.J. Reynolds*, *supra*, 37 Cal.4th at p. 731.) To decide whether the fine was constitutionally disproportionate, we consider: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*R.J. Reynolds*, *supra*, 37 Cal.4th at p. 728.)

The trial court carefully considered Overstock's culpability, explaining that the seriousness of the misconduct was moderate, but that the offending practices were numerous, persistent, and willful, and the record fully supports these findings. The penalty the court set was both far below the maximum allowed by statute and well within Overstock's ability to pay. The penalty was not constitutionally disproportionate.

**D.    Injunctive Relief**

Overstock makes several challenges to the injunctive relief ordered by the trial court. It first challenges the injunction as a whole on the ground that there was no substantial evidence that its practices violated the FAL and UCL. Because we conclude the trial court's findings are supported by substantial evidence, we necessarily reject this

32

challenge to the injunction. As a fallback, Overstock challenges three specific aspects of the injunction.[17]

"Section 17203, part of the UCL, and section 17535, part of the FAL, authorize the court to enjoin persons who have engaged in unfair competition. They provide that '[t]he court may make such orders or judgment . . . as may be necessary to prevent the use or employment by any person' of practices which violate their respective chapters. (§§ 17203, 17535.) . . . '[T]he court's discretion is very broad' and . . . this language 'is . . . a grant of broad equitable power.' [Citation.] . . . 'The remedial power granted under these sections is extraordinarily broad. Probably because false advertising and unfair business practices can take many forms, the Legislature has given the courts the power to fashion remedies to prevent their "use or employment" in whatever context they may occur.' [Citation.] Accordingly, we review the court's injunction for abuse of discretion." (*People v. JTH Tax, Inc.*, *supra*, 212 Cal.App.4th at p. 1257.)

Overstock argues the trial court acted improperly in enjoining the use of formulas to set ARP's because it discontinued that practice in 2008, several years before trial. It points out that injunctive relief " 'has no application to wrongs which have been completed [citation], absent a showing that past violations will probably recur. [Citation.]' [Citation.]" (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 465; see also *People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 631.) While this is a close issue, we conclude the trial court acted within its discretion in enjoining the use of formulas. Overstock continued to take the position that the use of formulas was proper; in its post-trial brief it argued that formulas in fact matched the actual selling price of retailers who used the same formulas to set their selling prices. Even after ceasing the use of formulas, it continued to use other misleading practices, such as basing

---

[17] In its opening brief, Overstock challenged a fourth aspect of the injunction, relating to adding the costs of shipping to the price identified by the validation process. In its reply brief, Overstock abandons this challenge.

ARP's on nonidentical products. On these facts, the trial court acted within its discretion in rejecting Overstock's argument that it could not properly enjoin the use of formulas. (See *Robinson v. U-Haul Co. of California* (2016) 4 Cal.App.5th 304, 314-317.)

Overstock also challenges the portion of the judgment enjoining it from "[u]sing the ARP nomenclature 'MSRP' or some other marketing term or acronym unless a clear and conspicuous hyperlink defines that term or acronym . . . *and* state[s] that that term or acronym may not be the prevailing market price (or, alternatively, may not be the regular retail price)[.]" According to Overstock, the People never claimed this label was misleading. However, the record contains evidence that some MSRP's were inflated or higher than the "street price." The court could properly enjoin the unqualified use of the term.

Finally, Overstock contends the trial court acted improperly in enjoining it from "[a]dvertising an ARP for longer than 90 days from the date on which the ARP was verified as a posted price, unless the ARP is re-verified after that period." Overstock argues, again, that the injunction is unnecessary because it already employs a 90-day validation period. But this practice was instituted only in 2011, after this litigation was commenced. In the absence of an injunction, Overstock retains the ability to abandon that practice, and an injunction is appropriate irrespective of Overstock's stated intent. (*People ex rel. Feuer v. Superior Court* (*Cahuenga's the Spot*) (2015) 234 Cal.App.4th 1360, 1385; *Dept. of Agriculture v. Tide Oil Co.* (1969) 269 Cal.App.2d 145, 150.) We see no abuse of discretion in requiring Overstock to apply its current practice of revalidating prices every 90 days under the new requirements imposed by the injunction.

## III. DISPOSITION

The judgment is affirmed.

 

 

 

 

 

                                               _____

                                               Rivera, J.

We concur:

_____

Ruvolo, P.J.

_____

Reardon, J.

People v. Overstock.Com, Inc. (A141613)

| | |
|---|---|
| Trial Court: | Alameda County |
| Trial Judge: | Wynne S. Carvill |
| | |
| Counsel for Appellant Overstock.Com, Inc.: | Robert Feldman, Daniel Bromberg, Sha Londa Hill-Castanon, Kimball Dean Parker, and Meredith Shaw, Quinn Emanuel Urquhart & Sullivan, LLP. |
| Counsel for Respondent The People: | Matthew Beltramo, Alameda County District Attorney. |
| Counsel for Amicus Curiae for Respondent The People of the State of California: | Sheldon Jaffe, Deputy Attorney General. |